**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY BLUBAUGH, individually and on behalf of a class of all persons and entities similarly situated, | : | CASE NO.: 4:25-cv-00607-BCW |
| Plaintiff, | : | |
| vs. | : | |
| HEALTHCARE SOLUTIONS INSURANCY AGENCY LLC, | : | |
| Defendant. | : | |

______________________________________/

**PLAINTIFF'S OPPOSITION TO**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**FACTUAL BACKGROUND** .......... **2**

**LEGAL STANDARD** .......... **6**

**ARGUMENT** .......... **6**

**1. Healthcare Solutions does not dispute the prima facie Do Not Call Registry claim... 6**

**2. A jury must decide whether Healthcare Solutions obtained Plaintiff's prior express written permission.** .......... **7**

a. Healthcare Solutions' consent record is a hearsay-laden, third-party document that its own witness cannot authenticate. .......... 7

b. The consent record's own data undermines the reliability Healthcare Solutions asks the Court to assume. .......... 8

c. Healthcare Solutions' own sworn discovery responses contradict the consent narrative it now offers on summary judgment. .......... 9

d. The consent language Healthcare Solutions points to does not, on its own terms, authorize Healthcare Solutions to call. .......... 11

e. The purported electronic record is not a signed agreement between Plaintiff and Healthcare Solutions. .......... 13

**3. Alternatively, Healthcare Solutions cannot meet its burden on the regulatory safe harbor, and its own discovery responses prove it.** .......... **14**

a. The safe harbor is an affirmative defense on which Healthcare Solutions bears the burden of proving every element. Failure on any one element defeats it. .......... 15

b. Healthcare Solutions proves no written procedures or National Registry training, and its own sworn discovery responses say so. .......... 16

c. Healthcare Solutions offers no evidence it ever scrubbed, subscribed to, or used the National Registry. .......... 17

d. Healthcare Solutions' claimed reliance on the Zeeto lead was not reasonable, and its own discovery responses confirm Healthcare Solutions never tested it. .......... 19

e. Ten calls in six days is not an "isolated error." .......... 20

**CONCLUSION** .......... **20**

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 6

*Benzion v. Vivint, Inc.*,
No. 12-61826-CIV, 2014 WL 11531368 (S.D. Fla. Jan. 17, 2014) .......... 6, 15

*Eaton v. Marion Cnty. Fair Ass'n*,
172 F. Supp. 2d 1184 (S.D. Iowa 2001) .... 15
*Hossfeld v. Allstate Ins. Co.*,
726 F. Supp. 3d 852 (N.D. Ill. 2024) .... 7
*Hoy v. Medicare Health Advisors LLC*,
No. 4:25-cv-00207-RGE-HCA, 2026 WL 2622653 (S.D. Iowa Aug. 7, 2026) ... 8, 9, 12, 17, 18
*Klassen v. Advanced Mktg. & Processing, Inc.*,
No. 8:21-CV-761-MSS-MRM, 2023 WL 11910565 (M.D. Fla. Mar. 1, 2023) .... 15
*Mantha v. QuoteWizard.com, LLC*,
347 F.R.D. 376 (D. Mass. 2024) .... 13
*Mey v. Liberty Home Guard, LLC*,
No. 5:23-CV-281, 2026 WL 486556 (N.D.W. Va. Jan. 5, 2026) .... 17
*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012) .... 12
*Simmons v. Charter Commc'ns, Inc.*,
222 F. Supp. 3d 121 (D. Conn. 2016), aff'd, 686 F. App'x 48 (2d Cir. 2017) .... 15

**Statutes**

15 U.S.C. § 7006(5) .... 13
47 U.S.C. § 227(c)(5) .... 6

**Regulations**

47 C.F.R. § 64.1200(c)(2) .... 1, 6, 7, 12, 13, 15, 16, 18, 20
47 C.F.R. § 64.1200(c)(2)(i) .... 1, 15, 16, 18, 20
47 C.F.R. § 64.1200(c)(2)(i)(A)-(E) .... 15, 16
47 C.F.R. § 64.1200(c)(2)(ii) .... 1, 7, 12, 13
47 C.F.R. § 64.1200(e) .... 6
47 C.F.R. § 64.1200(f)(9) .... 11

**Rules**

Fed. R. Civ. P. 56(a) .... 6

**Other Authorities**

In re Rules & Regs. Implementing the TCPA, 27 FCC Rcd. 1830 (2012) .... 12, 13
47 C.F.R. § 64.1200(c)(2)(ii) .... 1, 7
47 C.F.R. § 64.1200(e) .... 7
47 C.F.R. § 64.1200(f)(9) .... 12

**Rules**

Fed. R. Civ. P. 56(a) .... 6

**Other Authorities**

In re Rules & Regs. Implementing the TCPA, 27 FCC Rcd. 1830 (2012) .... 12

## INTRODUCTION

This Court should deny Defendant Healthcare Solutions Insurancy Agency LLC's ("Healthcare Solutions" or "Defendant") motion for summary judgment.

Healthcare Solutions' motion rests on two pillars, and each collapses on inspection. First, Healthcare Solutions contends that Plaintiff Jeffery Blubaugh gave prior express written permission under 47 C.F.R. § 64.1200(c)(2)(ii) by submitting his information online. But Healthcare Solutions' own Chief Marketing Officer has since conceded, under oath, that Exhibit B — the document the motion calls Plaintiff's "consent disclosure" — is "not the exact form that Plaintiff necessarily would have seen," because Healthcare Solutions "were not able to produce exactly what the plaintiffs saw in 2024." (Vickers Dep. (Ex. 4) 20:7–11.) Healthcare Solutions' own December 2025 discovery responses, moreover, swore that no documents evidenced any vendor relationship that provided Plaintiff's information. (Def.'s Resp. to Interrogs. Nos. 6, 9.)

Second, Healthcare Solutions argues, in the alternative, that it is entitled to the regulatory safe harbor, 47 C.F.R. § 64.1200(c)(2)(i) — an affirmative defense on which it bears the burden of proving every element. It proves none of them. Healthcare Solutions has since admitted, in its Supplemental Response to Interrogatory No. 11 (Ex. 3) and again at deposition, that it "did not utilize a process to scrub telephone numbers against the National DNC Registry before placing outbound calls" to Plaintiff, and that it had no written do-not-call policy of any kind until January 1, 2026 — six months *after* the calls at issue. (Def.'s Supp. Interrog. Resp., Interrog. No. 11; Morgan Dep. (Ex. 5) 39:1–12, 39:13–25; 58:15–25.) Its claimed reliance on the Zeeto/ScoredIt lead was equally unreasonable: the lead's own IP-geolocation data places the submission in Hutchinson, Kansas, roughly 230 miles from Plaintiff's Independence, Missouri residence. Vickers Decl. Ex. A.

## FACTUAL BACKGROUND

Plaintiff Jeffery Blubaugh resides in Independence, Missouri. (Declaration of Jeffery Blubaugh ("Blubaugh Decl.") (Ex. 1) ¶ 3.) His cellular telephone number ending in 2682 (the "Subject Number") is a non-commercial number used for personal, residential purposes only, and it has been listed on the National Do Not Call Registry since July 2, 2024. (Blubaugh Decl. ¶¶ 4-6.) Plaintiff has never been a Healthcare Solutions customer and never consented to receive calls from Healthcare Solutions. (Blubaugh Decl. ¶ 7.)

Healthcare Solutions' own Convoso export reflects ten calls to the Subject Number between July 3 and July 8, 2025, all placed as part of "Outbound Campaign OU65." (Declaration of Brad Morgan ("Morgan Decl.") ¶ 7 & Ex. A.) Healthcare Solutions did not place Plaintiff's number on its internal do-not-call list until July 13, 2025 — five days after that call, and after at least ten total calls. (Morgan Decl. ¶ 15 & Ex. A.)

Healthcare Solutions does not claim it obtained Plaintiff's number directly. It claims the number arrived through an online process involving a vendor, Zeeto, and a consumer-facing property called "ScoredIt," "held through Tibrio LLC." (Declaration of Jordan Vickers ("Vickers Decl.") ¶ 6.) Healthcare Solutions' Chief Marketing Officer, Jordan Vickers, testifies that Healthcare Solutions' own Azure SQL database reflects a September 10, 2024 submission bearing Plaintiff's name, phone number, email, date of birth, and address, associated with "Creative ID B10242316" and an accompanying consent disclosure that names Healthcare Solutions. (Vickers Decl. ¶¶ 10-16 & Exs. A-B.) But Mr. Vickers has no personal knowledge of what ScoredIt's website actually displayed to whoever submitted that information in September 2024; he reviewed Healthcare Solutions' own database, not any record maintained by Zeeto, Tibrio, or ScoredIt. (Id. ¶¶ 8-9, 13.) When Healthcare Solutions attempted, in July 2026, to

document what the ScoredIt consumer journey actually looks like, it conducted what its own witness admits was not a recreation of Plaintiff's alleged 2024 session, and "the Healthcare Solutions offer did not appear during the test" at all. (Id. ¶ 20 & Ex. C.) The screenshots Healthcare Solutions did produce show a generic "free sample" giveaway funnel for Tide laundry products that collects a name, birthday, phone number, and address behind a single consent checkbox authorizing contact by "Scored It and its marketing partners, Boundless Media, Coupon Cart Daily, Samples Network, The Free Sample Guide, Unified Marketing Partners, and its subsidiaries, the FHTA, National Health Advisors… and National Capital Advisors… Savings Partner Network and its Marketing Partners and affiliates" — a list of companies that does not include Healthcare Solutions anywhere. (Id. Ex. C.) The separate Healthcare Solutions Medicare Advantage "creative" that Healthcare Solutions relies on as Plaintiff's operative consent (Ex. B) never appears anywhere in the reconstructed funnel Healthcare Solutions itself produced.

Mr. Vickers confirmed all of this at his deposition. Asked directly whether Exhibit B "is not the exact consent form necessarily that Plaintiff would have seen," he agreed: "Yes. Correct. We were not able to produce exactly what the plaintiffs saw in 2024." (Vickers Dep. 20:7–11.) He likewise agreed that, in the sample Healthcare Solutions did produce, Healthcare Solutions is not named anywhere within the text of the consent box itself — "In this sample, it doesn't." (Id. 22:19–23:1.) And he conceded that the phone number displayed on the consent screen was not typed in by whoever filled out the form, but was auto-populated by the system from information already "provided at an earlier stage" in the funnel. (Id. 26:7–18.) Mr. Vickers further disputed the characterization Healthcare Solutions' own summary judgment motion gives the code

appearing on Exhibit B, testifying that it is not a "creative ID" at all but "a compliance — compliance code from our FMO." (Id. 30:3–6.)

The same record undercuts itself in another respect. The submission's own IP-geolocation fields show the IP address associated with the September 10, 2024 lead resolving to Hutchinson, Kansas — with a listed "IP Geo Min Distance Miles" of 18.78984833 and a characterization of "metro proximity" — even though the lead itself lists Plaintiff's address as Independence, Missouri, and Hutchinson, Kansas is roughly 230 highway miles, and no part of the same metropolitan area, from Independence, Missouri. (Vickers Decl. Ex. A.)

Discovery painted the same picture the summary judgment record does now, only earlier and emptier. Served with Plaintiff's First Set of Interrogatories in the fall of 2025, Healthcare Solutions was asked to state all facts supporting its contention that Plaintiff consented and to identify the date and means of that consent; Healthcare Solutions answered only that "Plaintiff provided a prior written consent to be contacted by Defendant" and that it "is continuing to investigate the response to this Interrogatory and will supplement this response as discovery continues." (Defendant's Answers, Responses, and Objections to Plaintiff's First Set of Interrogatories and Requests for Production of Documents, dated December 23, 2025 ("Def.'s Discovery Resps.") (Ex. 2), Interrog. No. 6.) Asked to identify the system or platform used to contact Plaintiff, Healthcare Solutions gave the identical non-answer. (Id. Interrog. No. 9.) Asked to describe, in detail, the process by which it or any vendor "scrubbed" telephone numbers against the National Do Not Call Registry, including the persons involved, the software used, and the frequency of scrubs, Healthcare Solutions answered that it "is continuing to investigate." (Id. Interrog. No. 11.) Asked to identify the person or entity responsible for TCPA or Do Not

Call Registry compliance, Healthcare Solutions gave the same non-answer. (Id. Interrog. No. 13.) None of these responses was ever supplemented in the record before this Court.

More strikingly, when Plaintiff requested "all contracts or documents representing agreements with any vendor that provided you with the Plaintiff's telephone number or information," and "all internal communications at your company regarding any vendor that provided you with the Plaintiff's telephone number or information," Healthcare Solutions responded, under oath, that "no documents exist responsive to this request." (Def.'s Discovery Resps., Resp. to Reqs. for Produc. Nos. 6-7.) The identical sworn answer was given to parallel requests for communications with, or concerning, "any third party that provided you the Plaintiff's telephone number." (Id., Resp. to Reqs. for Produc. Nos. 11-12.) Yet the entire premise of Healthcare Solutions' summary judgment motion, filed seven months later, is a detailed narrative about its "relationship with Zeeto" and Zeeto's ScoredIt property, "held through Tibrio LLC," supposedly responsible for delivering Plaintiff's information. (Vickers Decl. ¶¶ 3, 6-7.)

Discovery on the safe-harbor defense followed the same arc. In Healthcare Solutions' Supplemental Responses to Plaintiff's First Set of Interrogatories ("Def.'s Supp. Interrog. Resp.") (Ex. 3), Healthcare Solutions admitted that it "did not utilize a process to scrub telephone numbers against the National DNC Registry before placing outbound calls" to Plaintiff, and that it "did not utilize National DNC scrubbing" at all during the relevant period. Healthcare Solutions' Chief Technology Officer, Brad Morgan, confirmed this under oath, as did Healthcare Solutions' designated training witness, Jacob Worrell, who testified that no written do-not-call or TCPA compliance policy of any kind existed until January 1, 2026 — six months after the calls to Plaintiff — and that training before then was verbal only. (Def.'s Supp. Interrog. Resp.,

Interrog. No. 11; Morgan Dep. 39:1–12, 39:13–25, 40:1–3, 58:15–25; Worrell Dep. (Ex. 6) 26:7–9.)

## LEGAL STANDARD

Summary judgment is proper only if the record shows that there is "no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The evidence of the nonmovant "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). These principles especially apply to Healthcare Solutions' safe harbor argument, because the safe harbor is an affirmative defense on which Healthcare Solutions, not Plaintiff, bears the burden. *Benzion v. Vivint, Inc.*, No. 12-61826-CIV, 2014 WL 11531368, at *6 (S.D. Fla. Jan. 17, 2014).

## ARGUMENT

### 1. Healthcare Solutions does not dispute the prima facie Do Not Call Registry claim.

The TCPA's implementing regulations prohibit initiating "any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry," 47 C.F.R. § 64.1200(c)(2), a protection that extends to cellular telephone subscribers, id. § 64.1200(e), and a person who receives more than one such call within any 12-month period by or on behalf of the same entity has a private right of action, 47 U.S.C. § 227(c)(5). Plaintiff's Subject Number is his personal, residential cellular number, and it has been registered on the National Registry since July 2, 2024, well before any call at issue. (Blubaugh Decl. ¶¶ 4-6.) Healthcare Solutions' own Convoso export reflects ten outbound solicitation attempts to that number between July 3 and July 8, 2025 alone, several of which connected, all made to solicit Healthcare Solutions' Medicare-related insurance products.

(Morgan Decl. ¶ 7 & Ex. A; Blubaugh Decl. ¶¶ 10-13.) Healthcare Solutions' motion does not contest any element of the prima facie claim. Its entire motion rests on two affirmative defenses: prior express written permission, and, in the alternative, the regulatory safe harbor.

### 2. A jury must decide whether Healthcare Solutions obtained Plaintiff's prior express written permission.

*a. Healthcare Solutions' consent record is a hearsay-laden, third-party document that its own witness cannot authenticate.*

The regulation requires a signed, written agreement authorizing the seller, i.e., Healthcare Solutions, to call, identifying the number to be called. 47 C.F.R. § 64.1200(c)(2)(ii). The FCC has recognized that this requirement may be satisfied through an electronic submission containing that authorization. But the "agreement" Healthcare Solutions relies upon here is not Healthcare Solutions' own record of an event it witnessed; it is a third party's record of what a consumer supposedly saw and clicked, more than a year before this lawsuit, layered through Zeeto, "Tibrio," and "ScoredIt." Mr. Vickers, Healthcare Solutions' CMO, testifies about Healthcare Solutions' own Azure SQL export, but admits he is relying on records generated by, and reflecting, a third party's website process that Healthcare Solutions did not create and does not operate. (Vickers Decl. ¶¶ 6-9, 13.) No declarant from Zeeto, Tibrio, or ScoredIt has authenticated what that website actually displayed to whoever submitted Plaintiff's information, and no one with personal knowledge has explained how the "Creative ID B10242316" disclosure Healthcare Solutions now relies upon (Ex. B) was actually incorporated into the flow a consumer would have seen. Courts routinely hold that such layered, unauthenticated third-party consent records are inadmissible hearsay that cannot support summary judgment. *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024) (denying summary judgment, holding third-party consent records were "hearsay within hearsay" absent additional foundation).

A court confronting the identical evidentiary gap on closely analogous facts reached the same conclusion just weeks ago, refusing to weigh a Medicare telemarketer's third-party lead and consent records because the defendant "offer[ed] no declaration of an individual with knowledge sufficient to lay the foundation for any hearsay exception," and was therefore "precluded from weighing these documents in considering [the] motion for summary judgment." *Hoy v. Medicare Health Advisors LLC*, No. 4:25-cv-00207-RGE-HCA, 2026 WL 2622653, at *5 (S.D. Iowa Aug. 7, 2026). The same defect is present, and the same result follows, here.

Healthcare Solutions' own attempt to fill that gap proves the point. In July 2026, Healthcare Solutions "conducted a controlled test using the URL and entry variant preserved in Plaintiff's opt-in record" to "document[] the current ScoredIt consumer journey." (Vickers Decl. ¶ 19.) But Mr. Vickers admits that "[t]he July 2026 test was not a recreation of Plaintiff's September 2024 session, and the Healthcare Solutions offer did not appear during the test." (Id. ¶ 20.) The screenshots Healthcare Solutions did produce show a four-step "free sample" giveaway for Tide products, collecting a name, birthday, gender, phone number, and address behind a single consent checkbox that names a long list of "marketing partners" — but not Healthcare Solutions. (Id. Ex. C.) Nowhere in that reconstructed funnel does the Healthcare Solutions Medicare Advantage screen (Ex. B) that Healthcare Solutions says Plaintiff separately clicked "Yes" to ever appear. A reconstruction that omits the very disclosure at issue is no authentication of it at all, and it is Healthcare Solutions' own evidence that says so.

*b. The consent record's own data undermines the reliability Healthcare Solutions asks the Court to assume.*

Healthcare Solutions' own Azure SQL export includes IP-geolocation fields for the September 10, 2024 submission. Those fields show the submission IP address resolving to

Hutchinson, Kansas, an "IP Geo Confidence Tier" of "High," and an "IP Geo Reasoning" of "No city/state match, but metro proximity within 18.8 miles." (Vickers Decl. Ex. A.) But the lead itself lists Plaintiff's address as Independence, Missouri, and Hutchinson, Kansas is not "within 18.8 miles" of Independence, Missouri, nor in the same metropolitan area; it is more than 200 highway miles away, on the opposite side of the state of Kansas. A record that mischaracterizes a two-hundred-plus-mile discrepancy as "metro proximity" is not the kind of reliable, contemporaneous business record from which a court can conclude, as a matter of law, that Healthcare Solutions obtained Plaintiff's actual, personal consent. At minimum, it is evidence a jury is entitled to weigh, not evidence this Court must credit.

Courts confronting facially implausible lead data reach the same conclusion. In *Hoy*, a lead's own data listed the consumer's birth year as one that made him categorically ineligible for the very Medicare product the defendant claimed he had consented to purchase, and the court held that discrepancy alone created "a genuine issue of material fact as to whether the purported consent was so facially flawed and illogical that no reasonable person could rely upon it." *Hoy v. Medicare Health Advisors LLC*, No. 4:25-cv-00207-RGE-HCA, 2026 WL 2622653, at *5. Healthcare Solutions' own "metro proximity" mischaracterization of a two-hundred-plus-mile discrepancy is no more reliable.

*c. Healthcare Solutions' own sworn discovery responses contradict the consent narrative it now offers on summary judgment.*

Healthcare Solutions' summary judgment motion presents, for the first time, a detailed account of a "relationship with Zeeto," under which "ScoredIt was an owned-and-operated consumer property within Zeeto's corporate group, held through Tibrio LLC." (Vickers Decl. ¶ 6.) But when Plaintiff served written discovery in the fall of 2025 asking Healthcare Solutions to

identify "all contracts or documents representing agreements with any vendor that provided you with the Plaintiff's telephone number or information," and "all internal communications at your company regarding any vendor that provided you with the Plaintiff's telephone number or information," Healthcare Solutions responded, under oath and without qualification, that "no documents exist responsive to this request." (Def.'s Discovery Resps., Resp. to Reqs. for Produc. Nos. 6-7.) Asked for all communications with, or concerning, "any third party that provided you the Plaintiff's telephone number," Healthcare Solutions gave the identical sworn answer. (Id., Resp. to Reqs. for Produc. Nos. 11-12.) And asked directly to state all facts supporting its consent contention and to identify the date and means of consent, Healthcare Solutions answered only that it was "continuing to investigate" — the same non-answer it gave when asked to identify the dialing platform used to call Plaintiff. (Id., Interrogs. Nos. 6, 9.) None of these responses was ever supplemented. Healthcare Solutions cannot now be permitted to manufacture, for summary judgment, a fully-formed vendor relationship and consent narrative that it swore under oath, months earlier, was unsupported by any document and still under investigation. At minimum, the timing and content of that transformation is a matter for cross-examination and the jury, not a basis for judgment as a matter of law.

Healthcare Solutions' discovery responses are inconsistent in another respect that bears on credibility. Asked to identify all employees or vendors involved in the calling campaign, Healthcare Solutions stated that its calls are placed only "after" prior express written consent or an established relationship, and that, with respect to Plaintiff specifically, its representative spoke with him only "after Plaintiff provided his prior express written consent." Yet the same response asserts that Healthcare Solutions' "telephone calls are not telemarketing, but purely informational in nature." (Def.'s Discovery Resps., Resp. to Interrog. No. 2.) That

characterization cannot be squared with Plaintiff's own sworn declaration testimony, or with Healthcare Solutions' own summary judgment theory, that its representative asked Plaintiff about his age and insurance coverage and solicited him to purchase a health insurance plan. (Blubaugh Decl. ¶¶ 11, 13.) A defendant that cannot consistently characterize its own calls has not carried its burden of showing, as a matter of law, what those calls were or that Plaintiff authorized them.

The contradiction was never cured, and Healthcare Solutions' own witness has now admitted as much. At his deposition, Jordan Vickers confirmed that Healthcare Solutions' *supplemental* response to RFP No. 6 still maintained that "defendant has no responsive documents in its possession, custody, or control" — the identical position taken in December 2025, notwithstanding the detailed Zeeto narrative Healthcare Solutions now offers on summary judgment. (Vickers Dep. 32:5–14; 33:1.) Mr. Vickers also disputed the characterization Healthcare Solutions' own motion gives to the code on Exhibit B, testifying that it is not a "creative ID" but "a compliance — compliance code from our FMO." (Id. 30:3–6.) A summary judgment motion should not rest on a description of its own key exhibit that the motion's own witness disavows.

*d. The consent language Healthcare Solutions points to does not, on its own terms, authorize Healthcare Solutions to call.*

The FCC's prior express written consent regulation requires, at minimum, a written agreement that "clearly authorizes *the seller* to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice…." 47 C.F.R. § 64.1200(f)(9) (emphasis added). The definite article—"the seller" rather than "a seller"—is deliberate and demands identification of the

specific entity authorized to call. The FCC confirmed this in its 2012 Order, explaining that consent must show the consumer "will receive future calls that deliver prerecorded messages by or on behalf of *a specific seller*." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd 1830, 1844 (2012) (¶ 33) (emphasis added). Congress enacted the TCPA precisely to protect against the "intrusive invasion of privacy" caused by unrestricted telemarketing. *Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 372 (2012). The seller-specificity requirement gives that protection meaning: consumers must know who they are authorizing to call them.

The seller-identification requirement is, in any event, independently and even more explicitly codified in the DNC Registry provision directly applicable to this case. Section 64.1200(c)(2)(ii) provides that calls to numbers registered on the National Do Not Call Registry are exempted from the prohibition on such calls only where consent is "evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by *this seller*." 47 C.F.R. § 64.1200(c)(2)(ii) (emphasis added). The phrase "this seller"—a demonstrative pronoun requiring specific, identified reference—leaves no ambiguity whatsoever.

A court applying this exact rule to a Medicare telemarketer's own consent disclosure reached the identical result on the identical defect: where the disclosure listed several other sellers but omitted the defendant, "[the defendant] is not listed. Consent to be contacted by one seller is not consent to be contacted by all sellers," precluding summary judgment on the consent defense. *Hoy v. Medicare Health Advisors LLC*, No. 4:25-cv-00207-RGE-HCA, 2026 WL 2622653, at *6 (quoting *Mantha*, 347 F.R.D. at 397). The same omission defeats Healthcare Solutions' consent defense here.

"[Consenting] to receive [calls] from Chevrolet is not consent to receive texts from Mercedes." *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 397 (D. Mass. 2024). The only consent checkbox that Healthcare Solutions' own reconstructed record actually shows being presented to a consumer authorizes contact by "Scored It and its marketing partners, Boundless Media, Coupon Cart Daily, Samples Network, The Free Sample Guide, Unified Marketing Partners, and its subsidiaries, the FHTA, National Health Advisors… and National Capital Advisors… Savings Partner Network and its Marketing Partners and affiliates." (Vickers Decl. Ex. C.) Healthcare Solutions is not named anywhere in that list. Healthcare Solutions asks the Court to assume that a second, separate creative (Ex. B), which does name Healthcare Solutions, was actually served to Plaintiff as part of the same session — but that is precisely the assumption its own July 2026 test refused to make, since the Healthcare Solutions offer never appeared when Healthcare Solutions tried to reproduce the flow. (Id. ¶ 20.)

*e. The purported electronic record is not a signed agreement between Plaintiff and Healthcare Solutions.*

Section 64.1200(c)(2)(ii) requires more than a lead record bearing a consumer's contact information. It requires "a signed, written agreement between the consumer and seller" stating that the consumer agrees to be contacted by "this seller." 47 C.F.R. § 64.1200(c)(2)(ii). The FCC permits an electronic signature to satisfy that requirement only if it is valid under the E-SIGN Act. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 34 (2012). Under that Act, an electronic signature must be an electronic sound, symbol, or process that is attached to or logically associated with a contract or other record and "executed or adopted by a person with the intent to sign the record." 15 U.S.C. § 7006(5).

Healthcare Solutions has not produced evidence from which the Court could find, as a matter of law, either a signed agreement between these two parties or a valid electronic signature by Plaintiff. Healthcare Solutions did not own or operate the ScoredIt website, did not design or control the consumer flow, and did not witness Plaintiff execute any agreement. Its asserted connection to the transaction runs through third parties—Zeeto, Tibrio, and ScoredIt—and its own witness conceded that Healthcare Solutions "were not able to produce exactly what the plaintiffs saw in 2024." (Vickers Dep. 20:10–11.) The later controlled test did not cure that defect: Healthcare Solutions admits that the test was not a recreation of Plaintiff's September 2024 session and the Healthcare Solutions offer did not appear at all. (Vickers Decl. ¶¶ 19–20.)

Nor does Exhibit B establish Plaintiff's electronic signature. Healthcare Solutions has not identified any checkbox, typed name, click, or other process on Exhibit B that Plaintiff executed or adopted with the intent to sign an agreement with Healthcare Solutions. To the contrary, Mr. Vickers testified that the telephone number shown on Exhibit B was auto-populated from information collected earlier in the funnel rather than entered by the person at the point of alleged consent. (Vickers Dep. 26:7–18.) And the only checkbox Healthcare Solutions actually reproduced names Scored It and a list of other marketing partners—not Healthcare Solutions. (Vickers Decl. Ex. C.) On this record, the most Healthcare Solutions can show is that a third-party system associated Plaintiff's contact information with a downstream lead record. That is not proof that Plaintiff signed an agreement with Healthcare Solutions.

The absence of a bilateral agreement is independently fatal. At the very least, these defects create fact questions concerning notice, assent, attribution, and intent to sign that preclude summary judgment.

**3. Alternatively, Healthcare Solutions cannot meet its burden on the regulatory safe harbor, and its own discovery responses prove it.**

*a. The safe harbor is an affirmative defense on which Healthcare Solutions bears the burden of proving every element. Failure on any one element defeats it.*

The safe harbor on which Healthcare Solutions' motion alternatively depends provides that a seller "will not be liable for violating" the Registry rules "if [it] can demonstrate" that the violation "is the result of error" and that, "as part of its routine business practice," it meets each of five minimum standards. 47 C.F.R. § 64.1200(c)(2)(i). As Healthcare Solutions' own authority recites, those standards are:

> (a) the establishment and implementation of written procedures to comply with the national do-not-call rules; (b) the training of its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules; (c) the maintenance and recording of a list of telephone numbers that the seller may not contact; (d) the use of a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and the maintenance of records documenting this process; and (e) the use of a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database except in compliance with the do-not-call rules.

*Klassen v. Advanced Mktg. & Processing, Inc.*, No. 8:21-CV-761-MSS-MRM, 2023 WL 11910565, at *3-*4 (M.D. Fla. Mar. 1, 2023) (cleaned up); 47 C.F.R. § 64.1200(c)(2)(i)(A)-(E).

Because the safe harbor is an affirmative defense, Healthcare Solutions, not Plaintiff, bears the burden of proof on each element. *Benzion*, 2014 WL 11531368, at *6. A defendant must establish it meets each of the standards in 47 C.F.R. § 64.1200(c)(2)(i) in order to fall within the "safe harbor" provision. *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 129 (D. Conn. 2016), *aff'd*, 686 F. App'x 48 (2d Cir. 2017). And because Healthcare Solutions seeks summary judgment on its own affirmative defense, it must prove every element with evidence so one-sided that no reasonable jury could find against it, with all inferences drawn in Plaintiff's favor. *Eaton*, 172 F. Supp. 2d at 1187. Healthcare Solutions does not come close to meeting its burden on any element, let alone all five.

*b. Healthcare Solutions proves no written procedures or National Registry training, and its own sworn discovery responses say so.*

The first and second requirements are the establishment and implementation of written do-not-call compliance procedures and training of personnel addressing the National Registry specifically. 47 C.F.R. § 64.1200(c)(2)(i)(A), (B). Healthcare Solutions offers no written policy addressing the National Do Not Call Registry at all. The only training material in the record, attached to the Morgan Declaration, addresses Healthcare Solutions' internal "Do Not Call" disposition button in its Convoso dialer, not the National Registry, and nothing in Mr. Morgan's declaration identifies any document establishing or implementing National Registry compliance procedures. (Morgan Decl. ¶¶ 11-14 & Ex. B.) When Plaintiff asked Healthcare Solutions in discovery to identify the persons responsible for TCPA or Do Not Call Registry compliance, Healthcare Solutions answered only that it was "continuing to investigate." (Def.'s Discovery Resps., Interrog. No. 13.) A company that cannot identify its own compliance personnel under oath has not carried its burden of proving written, implemented compliance procedures.

Healthcare Solutions' own witnesses confirm the gap. Jacob Worrell, whom Healthcare Solutions designated to testify about training, agreed that before January 1, 2026 — six months *after* the calls to Plaintiff — Healthcare Solutions had no written do-not-call compliance procedures beyond a single onboarding slide, and that DNC training was otherwise conducted "verbally." (Worrell Dep. 26:3–9.) Brad Morgan, Healthcare Solutions' Chief Technology Officer, agreed that "prior to January 1, 2026," there was "no written" policy "other than" that one slide. (Morgan Dep. 39:13–25, 40:1–3.) Mr. Worrell also testified that Healthcare Solutions has never required agents to pass any compliance test on DNC or TCPA requirements, before or after 2026. (Worrell Dep. 32:24–33:15.) A single undocumented slide, reinforced by unrecorded verbal training that no one was ever tested on, is not the "establish[ed] and implement[ed]"

written procedure the regulation requires. This is not a novel proposition. A court recently rejected an after-the-fact policy on nearly identical facts, holding that a compliance memo "dated after the events at issue cannot establish that such written policy existed and was a routine business practice at the time of the calls at issue." *Hoy v. Medicare Health Advisors LLC*, No. 4:25-cv-00207-RGE-HCA, 2026 WL 2622653, at *4 (citing *Mey*, 2026 WL 486556, at *3).

*c. Healthcare Solutions offers no evidence it ever scrubbed, subscribed to, or used the National Registry.*

Healthcare Solutions has now admitted, in terms that leave nothing to inference, that it did not do this. Its Supplemental Response to Interrogatory No. 11 ("Def.'s Supp. Interrog. Resp.") states: "Healthcare Solutions did not utilize a process to scrub telephone numbers against the National DNC Registry before placing outbound calls" to Plaintiff, and "Healthcare Solutions did not utilize National DNC scrubbing because its business practice was to place outbound calls only to consumers who have provided prior express written consent, even if their phone numbers were on the DNC." Brad Morgan, Healthcare Solutions' Chief Technology Officer, confirmed this under oath not once but twice: "Correct," he testified, Healthcare Solutions "did not utilize a process to scrub numbers against the DNC before placing outbound calls" to Plaintiff. (Def.'s Supp. Interrog. Resp., Interrog. No. 11; Morgan Dep. 39:1–12, 58:15–25.) That is not a gap in the summary judgment record — it is an affirmative admission that element (D) of the safe harbor was never satisfied.

Healthcare Solutions' position is, if anything, weaker than the defendant's in the closest case to reach judgment on this element. There, when asked in discovery to "[i]dentify and describe in detail the process by which you (or any vendor acting on your behalf) 'scrubbed' telephone numbers against the National Do Not Call Registry," the defendant likewise answered

only that "it is continuing to investigate the response to this Interrogatory and will supplement this response as discovery continues," and never did. *Hoy v. Medicare Health Advisors LLC*, No. 4:25-cv-00207-RGE-HCA, 2026 WL 2622653, at *5. The court held that, "[w]ithout any admissible evidence at this point, there is a genuine issue of material fact as to whether [defendant] has met the requirements of element (D)," and denied summary judgment on the safe harbor defense. *Id.* The same interrogatory, the same non-answer, and the same silence in the summary judgment record compel the same result here — but Healthcare Solutions has gone further still, affirmatively admitting in its supplemental response that it never scrubbed at all.

The third, fourth, and fifth requirements are the maintenance of internal and national do-not-call lists and a process to prevent calls to registered numbers, employing a current version of the Registry. 47 C.F.R. § 64.1200(c)(2)(i)(C)-(E). Healthcare Solutions touts an internal do-not-call list with more than 2.7 million entries (Morgan Decl. ¶ 16), but the size of that list says nothing about whether Healthcare Solutions ever scrubbed against the National Registry, and the record shows it did not. When Plaintiff served an interrogatory asking Healthcare Solutions to "[i]dentify and describe in detail the process by which you (or any vendor acting on your behalf) 'scrubbed' telephone numbers against the National Do Not Call Registry," including the persons involved, the software or service providers used, and the frequency of such scrubs, Healthcare Solutions answered that it "is continuing to investigate the response to this Interrogatory and will supplement this response as discovery continues." (Def.'s Discovery Resps., Interrog. No. 11.) It never supplemented. Plaintiff separately requested "all documents, reports, or data files that reflect scrubbing of call lists against the National Do Not Call Registry," and Healthcare Solutions agreed to produce responsive, non-privileged documents "as to Plaintiff only." (Id., Resp. to Req. for Produc. No. 18.) No such document — no scrub log, no Registry subscription

record, no evidence Healthcare Solutions ever obtained a version of the Registry "no more than 31 days" before calling Plaintiff — appears anywhere in the summary judgment record. Neither the Vickers Declaration nor the Morgan Declaration mentions the National Registry at all, except to note that Plaintiff's own number happened to be registered. The most probative evidence of Healthcare Solutions' "process to prevent" solicitations to Registry numbers is that Healthcare Solutions called a Registry-listed number ten times in six days. (Morgan Decl. Ex. A.) That is not a safe harbor; it is the violation the safe harbor is meant to guard against.

*d. Healthcare Solutions' claimed reliance on the Zeeto lead was not reasonable, and its own discovery responses confirm Healthcare Solutions never tested it.*

The safe harbor requires implemented procedures "reasonably designed" to prevent unlawful solicitations. A seller whose own lead record places the consumer's submission IP address roughly 230 miles from the address on that same lead, and whose own confidence-scoring field papers over that gap by mischaracterizing it as "metro proximity within 18.8 miles" (Vickers Decl. Ex. A), and whose own reconstruction of the consent flow could not even locate the disclosure supposedly presented to the consumer (id. Ex. C), has not carried its burden of showing reasonable, implemented procedures. Nor did Healthcare Solutions ever audit or test that process before this lawsuit. Asked in discovery to identify the persons responsible for compliance, the software or service providers used to scrub numbers, and all facts supporting its consent contention, Healthcare Solutions could answer none of it as of December 2025 — months after the calls at issue — and stated only that it was "continuing to investigate." (Def.'s Discovery Resps., Interrogs. Nos. 6, 11, 13.)

Healthcare Solutions' own Chief Technology Officer could not say whether Healthcare Solutions ever audited Zeeto — the very vendor whose lead is the entire basis for the consent

defense — to confirm its lead lists excluded Registry-listed numbers. Asked whether Healthcare Solutions performed any audit of a vendor like "Scoredit," of the kind companies commonly use to verify a lead vendor's DNC compliance, Mr. Morgan answered, "I'm not sure," and, asked whether any written record of such an audit exists, answered, "I don't know, but that's not my scope." (Morgan Dep. 46:8–24.) A corporate witness's inability to say whether his own company ever checked its lead vendor's compliance is not evidence of reasonable reliance.

*e. Ten calls in six days is not an "isolated error."*

The safe harbor excuses a violation only if it "is the result of error" occurring despite routinely practiced compliance. 47 C.F.R. § 64.1200(c)(2)(i). Healthcare Solutions' own Convoso export shows ten separate dialing attempts to Plaintiff's registered number between July 3 and July 8, 2025 — eight answering-machine detections and two connected calls, one of which resulted in a nearly two-and-a-half-minute conversation in which Plaintiff was asked about his age and insurance coverage and solicited to purchase a health insurance plan. (Morgan Decl. ¶¶ 7-8 & Ex. A; Blubaugh Decl. ¶¶ 8-13.) That is not one errant call slipping through a functioning system; it is a sustained calling campaign to a single Registry-listed number over six days, with an internal DNC designation entered days after the last call. (Morgan Decl. ¶ 15.)

## CONCLUSION

The record presents genuine disputes of material fact, and Healthcare Solutions has failed to carry its burden on every element of its affirmative defenses. The Court should deny Defendant's Motion for Summary Judgment in its entirety.

RESPECTFULLY SUBMITTED AND DATED this 10th day of August, 2026.

*s/ Anthony I. Paronich*________________
Anthony I. Paronich (pro hac vice)

**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com
*Counsel for the Plaintiff and the putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2026, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all attorneys registered with the CM/ECF system.

*s/ Anthony I. Paronich*_______________
Anthony I. Paronich (pro hac vice)
**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com
*Counsel for the Plaintiff and the putative Class*